# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 09-CR-87** |
| **v.** | ) | |
| | ) | **Judge Joan H. Lefkow** |
| FRANK FARELLA, | ) | |
| DONALD CATANZARO, and | ) | |
| MICHAEL BLAIS, | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Defendants Frank Farella, Donald Catanzaro and Michael Blais got caught in a sting operation set up by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in which they agreed to rob a drug stash house of 50 kilograms of cocaine. On October 26, 2011, after a three-week trial, the jury returned a verdict of guilty against all three men for conspiracy to possess with intent to distribute mixtures containing in excess of 5 kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1) and § 846 (Count I); attempted possession of the same (Count II); and possession of a firearm in furtherance of a drug trafficking crime in violation of 28 U.S.C. § 924(c)(1)(A) (Count III). Farella was also convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count IV). Before the court are defendants' post-trial motions for a judgment of acquittal or alternatively for a new trial. For the following reasons, the motions [Dkt. #238, #239, #240] will be denied.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 29 provides, in pertinent part, that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is

insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  When requesting a judgment of acquittal under Rule 29, a defendant "faces a nearly insurmountable hurdle [because] . . . [the court] consider[s] the evidence in the light most favorable to the Government, defer[s] to the credibility determination of the jury, and overturn[s] a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt."  *United States* v. *Blassingame*, 197 F.3d 271, 284 (7th Cir. 1999) (quoting *United States* v. *Moore*, 115 F.3d 1348, 1363 (7th Cir. 1997)).

Under Federal Rule of Criminal Procedure 33, a court may grant a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33.  "The decision to grant or deny a motion for new trial rests within the sound discretion of the trial court."  *United States* v. *Reed*, 875 F.2d 107, 113 (7th Cir. 1989).  The court may grant a new trial "in a variety of situations in which trial errors or omissions have jeopardized the defendant's substantial rights."  *United States* v. *Reed*, 986 F.2d 191, 192 (7th Cir. 1993) (citation omitted).  In deciding whether to grant a new trial under Rule 33, the court "may properly consider the credibility of witnesses, and may grant a new trial if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice."  *United States* v. *Washington*, 184 F.3d 653, 657 (7th Cir. 1999).

## BACKGROUND

**I.     Government's Evidence at Trial**

**A.     Farella's Initial Meeting with "Ace"**

Farella was first approached about robbing a drug stash house by a cooperating government informant named Steve who put him in touch with undercover ATF Special Agent Christopher Bayless, known to defendants as "Ace."  At trial, the government presented

evidence that between December 17, 2008 and January 29, 2009, Farella and Agent Bayless discussed the details of the robbery during recorded phone calls and in-person meetings. The transcripts of these discussions were introduced as evidence at trial.

In their first phone call on December 17, 2008, Agent Bayless asked Farella whether he wanted to do "a lick for about 50 birds," meaning a robbery for 50 kilograms of cocaine, to which Farella responded "brother, that's what I do." (Gov. Ex. T-1 at 2.)

On January 16, 2009, Farella met with Agent Bayless and Steve at an IHOP restaurant where Agent Bayless explained the details of the robbery, as follows: Agent Bayless would receive a call notifying him of the location of the stash house. He would then notify Farella and his crew, who would rob the stash house and then return to a safe location to divide up the loot with Agent Bayless and another confidential informant named Jamie, who was purportedly Ace's recently paroled cousin.

After the IHOP meeting, Farella began to assemble a crew to help. He contacted a friend, Catanzaro, to see if he was interested in participating in the scheme. Catanzaro, in turn, contacted Blais, whom Farella had never met. In subsequent conversations, Agent Bayless and Farella discussed and finalized the details of the robbery. Farella suggested doing the robbery dressed as police officers and lining the back of the getaway van with sandbags to stop incoming bullets. Farella also shared details about his crew with Agent Bayless, telling him that one member was "comin' down from Wisconsin," referring to Catanzaro, and the other member "does P.I. work for a livin,'" referring to Blais. (Gov. Ex. T-28 at 4.) At trial, the government offered defendants' telephone records into evidence, which demonstrated that Farella, Catanzaro and Blais were in regular contact in the days leading up to the robbery.

**B.      Portillo's Meeting**

On the evening of January 28, 2009, defendants assembled at Farella's house and then drove to a Portillo's restaurant to meet with Agent Bayless and Jaime. This meeting was video recorded by the government and offered as evidence at trial. (*See* Gov. Ex. T-29.) During the meeting, defendants expressed their willingness to engage in violence if needed to complete the robbery. For example, when discussing whether to restrain those guarding the drugs or to kill them, Blais said they had to be ready for "both scenarios," to which Farella responded, "[H]ere's the deal. We'll come out, dude, you got an opportunity to live. . . . They choose not to take that, that's on them." (*Id.* at 29.) As Farella explained to Agent Bayless, "Hey, you're sittin' with some heavy hitters, bro." (*Id.* at 35.)

At one point, Farella asked Agent Bayless to follow him to the men's bathroom. Agent Bayless testified that the two men entered a stall and Farella pulled a .45 caliber handgun out of his waistband and dropped the gun's magazine to show Agent Bayless that it was loaded.

Back at the table, Blais told Agent Bayless that he was a licensed private investigator. Blais offered to survey the neighborhood of the stash house in advance of the robbery using a hand held GPS device. Blais expressed no concern about being stopped by the police during this surveillance because he had "a pass." (*Id.* at 37.) The parties also discussed dividing up the drugs after the robbery, with Farella instructing Agent Bayless, "You'll take yours, we'll take ours." (*Id*. at 60.)

The meeting concluded and Blais said that defendants needed to "train and go through . . . a bunch of stuff tonight" and then they would go over the "final details" with Agent Bayless and Jamie in the morning. (*Id.* at 38–39.) Defendants then went out to the parking lot to inspect

the van that Agent Bayless had rented for the job. Farella reminded Agent Bayless to get sandbags for the back and Catanzaro suggested getting a diamond plate and using spray paint to black out the windows. Blais instructed Agent Bayless to give the van "a good wipedown" to eliminate any fingerprints. (*Id.* at 70.) Farella also told Agent Bayless that defendants were "comin' out as cops" during the robbery and that they had "[t]he vest, the badges" and the "tactical gear" they needed to look convincing. (*Id.* at 70–71.) "This is what we do," said Farella. (*Id.* at 71.)

### C. Day of Arrest

The next morning defendants visited army surplus stores to purchase needed gear. In the afternoon, defendants drove to what they believed to be the staging area for the robbery dressed in all black fatigues. When they arrived, they were promptly arrested. At the scene, agents recovered, among other items, a .12 gauge shotgun, a .45 caliber handgun, a .38 caliber revolver, multiple rounds of ammunition, two stolen license plates and tactical gear, including a tactical belt, a ballistic vest, a small gun holster, a collapsible baton, multiple items of clothing with the word "Police" printed on them, binoculars, handcuffs and Blais's GPS device.[1] Evidence introduced at trial demonstrated that defendants purchased some of this gear the morning of the robbery.

## II. Farella's Entrapment Defense

Prior to trial, the government filed a motion *in limine* to preclude evidence or argument of an entrapment defense by defendants. (Dkt. #87.) Farella then filed an *in camera* notice of

---

[1] The .38 caliber revolver, tactical belt, and collapsible baton were found in a suitcase labeled "M. Blais" in the trunk of Farella's car. A new pair of handcuffs and a police shirt were also found on the floor of the front passenger area where Catanzaro sat. Two knit police caps were on the console between Farella and Catanzaro and a police baseball cap was in the rear passenger area with Blais.

intent to present an entrapment defense along with an entrapment proffer. (Dkt. #131.) Shortly before trial, the court denied the government's motion and allowed Farella to present his defense. (Dkt. #204.)

At trial, Farella admitted to participating in the conspiracy but testified that he was not predisposed to do so and that Steve had induced him into committing the offense. As to his lack of predisposition, Farella testified that he was legitimately employed and stated that although he had been to prison in the past, he was now committed to living a law-abiding life.[2] He also testified that he had no experience with a drug deal of this size or type and that he was reluctant to go through with the offense.

As to his inducement by the government, Farella testified that an old acquaintance, Steve, contacted him multiple times suggesting that he participate in various illegal schemes.[3] These conversations were not recorded by the government but Farella introduced his phone records at trial, which supported his testimony.

Farella testified that he initially rejected Steve's illicit requests but eventually gave in after Steve convinced him that, with money from the robbery, he could obtain a costly medicine that could cure a potentially life-threatening disease from which Farella's sister suffered. According to Farella, Steve said that this medication was not available in the United States but that he had a contact who could obtain the medication from Canada for a limited time. Farella testified that he tried to get money for the medication from other sources with no luck. He said

---

[2] The government introduced evidence that Farella was convicted in 1997 of attempted armed robbery and aggravated battery and that in 2006 he was convicted of conspiracy to bring contraband into a penal institution. (*See* Dkt. #217 at 12 & 32 of 55.)

[3] During this time, Steve was considered an agent of the government.

that he agreed to participate in the robbery only because he believed he was running out of time to purchase this life-saving medication for his sister.

Prior to the Portillo's meeting with Jamie and Agent Bayless, Farella, Catanzaro and Blais met at Farella's house to discuss the robbery. Farella testified that Catanzaro and Blais were hesitant to go through with it but that he wanted to complete the job so he could pay for his sister's medication. Farella also testified that after the Portillo's meeting, Blais asked if he could spend the night at Farella's house and Farella agreed.

The next day, Farella spoke with Agent Bayless multiple times, and at one point told Agent Bayless that the robbery was off. He later changed his mind, however, telling Agent Bayless at 1:09 p.m. that "we're game to ride, bro. We're ready to roll." (Gov. Ex. T-36 at 3.) Shortly before 2:00 p.m., Farella, Catanzaro and Blais arrived at the staging area and were arrested.

### III. Blais's Defense

Prior to trial, Blais, like Farella, intended to present an entrapment defense and presented a sealed proffer as to entrapment. (Dkt. #126.) The court initially reserved ruling on whether such a defense was proper but later found that Blais had not presented sufficient evidence for a reasonable juror to find that he was entrapped. (*See* Dkt. #204; Tr. 2145, 2178–81, 2357–58.) Towards the end of trial, Blais indicated for the first time that he intended to take the stand in his own defense.

Blais testified that he arrived at Farella's house believing that he was there to discuss a contracting job and that the first time he learned about the robbery was when he was riding in Farella's car on the way to meet Jamie and Agent Bayless at Portillo's. Once he learned about

the plan, Blais said that he immediately felt scared. He had grown up in a gang-infested neighborhood and previously worked as a prison guard. Based on these experiences, Blais testified that he could tell that Farella was an "ex-con" and "a dangerous guy." (Tr. 2230.) This conclusion was supported by the fact that, according to Blais, he saw Farella pull a hand gun out of the glove compartment of the car in the parking lot of Portillo's. Blais testified that he had "no idea" what was going to happen at the Portillo's meeting and that his plan was to "get out of this with my life." (*Id.* at 2231.) He was afraid that Farella would hurt him or his family if he did not go through with the robbery.

After the meeting, Blais and Catanzaro got back in the car with Farella, who, according to Blais, told them that he had "stuck a gun in [Agent Bayless's] mouth and told him that if he fucks us, I'm going to kill him." (*Id.* at 2243.) Once they returned to Farella's house, Catanzaro went home but Farella pushed him to stay the night. Blais stated that he agreed to stay because he was "afraid," explaining that he "wouldn't say it [was] a kidnapping" but that Farella "strongly suggested" that he spend the night, so he did. (*Id.* at 2246, 2329–30.)

Blais confirmed that the day of his arrest defendants visited army surplus stores and purchased needed gear. He testified that defendants dressed in black fatigues to "to give the appearance like we're ready to do this" but that he had no intention of actually going through with the robbery. (*Id.* at 2252.)

On cross-examination, the government challenged Blais's purported fear of Farella, highlighting Blais's ability to assess the nature of Farella's character given his prior experiences. For example, the government stated that Blais grew up in a "very tough neighborhood" that was "full of gangs" and that he worked as a corrections officer where "[d]ay after day [he] would be

around tough people" and, as a result, he "knew how to size up certain people." (*Id.* at 2270–71.)

The government also inquired about five bullets that Blais admitted were missing from the box of ammunition for his .38 caliber handgun. Blais testified that he had previously used those bullets at the target range, to which the government responded, "[N]ormally when you shoot a gun, you shoot more than five rounds" because "[y]ou are shooting it in order to try and gain accuracy with your shooting ability, correct?" (*Id.* at 2312.) But this time, "you weren't trying for accuracy . . . you were trying to see if a .38 caliber revolver worked, weren't you?", implying that Blais was planning to use the gun in the robbery. (*Id.*) Blais's counsel immediately objected and moved for a mistrial, which the court denied.

At the close of Blais's cross-examination, the government asked the court to instruct the jury on the requirements of a coercion defense. As explained by the government, "Mr. Blais is saying in essence that[,] maybe if he wasn't quite kidnapped by Mr. Farella, he did feel some kind of duress and was going along because of some kind of fear. . . . That's obviously a very different claim than not having the requisite intent." (*Id.* at 2343–44.) The court agreed and ultimately gave the government's proffered coercion instruction over Blais's objection.

Finally, Farella took the stand in rebuttal. He testified that he never stuck a gun in Agent Bayless's mouth and never told Blais that he did. He also testified that he discussed the details of the robbery with Catanzaro and Blais at his house before they went to Portillo's. Blais's attorney cross-examined Farella, accusing him of lying to and "conning" Agent Bayless and his crew. (*Id.* at 2366–67.) At the close of Farella's rebuttal testimony, both he and Blais moved for severance and a mistrial based on antagonistic defenses. (*Id.* at 2414.) The court later denied the

motions without prejudice, allowing the parties to raise these issues in their post-trial motions, which are now pending.  (*Id.* at 2680–81.)

## ANALYSIS

### I.     Severance

Defendants each argue that they are entitled to a judgment of acquittal or, in the alternative, a new trial because the court denied their respective motions to sever.  (*See* Tr. 2680–81; Dkt. #149.)  Federal Rule of Criminal Procedure 8(b) provides for joinder of defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  If joinder "appears to prejudice a defendant," however, the court may sever that defendant for trial. Fed. R. Crim. P. 14(a).  The court has "a strong preference" to try co-conspirators together, *United States* v. *Spagnola*, 632 F.3d 981, 987 (7th Cir. 2011), because "[i]n all but the 'most unusual circumstances,' the risk of prejudice arising from a joint trial is 'outweighed by the economies of a single trial in which all facets of the crime can be explored once and for all.'" *United States* v. *Alviar*, 573 F.3d 526, 539 (7th Cir. 2009) (quoting *United States* v. *Velasquez*, 772 F.2d 1348, 1352 (7th Cir. 1985)).  As such, the decision to sever a trial is left to the sound discretion of the trial court.  *United States* v. *Rivera*, 6 F.3d 431, 437 (7th Cir. 1993).

There are instances, however, when severance is essential to a fair trial.  To demonstrate that the court erred in denying severance, a defendant must show that the "joint trial . . . compromise[d] a specific trial right of one of the defendants, or prevent[ed] the jury from making a reliable judgment about guilt or innocence."  *Zafiro* v. *United States*, 506 U.S. 534, 539, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993); *United States* v. *Vallone*, 698 F.3d 416, 486 (7th

Cir. 2012). For example, mutually antagonistic defenses may present such a situation. (Defenses are mutually antagonistic "when the acceptance of one defense precludes any chance of acquittal for the other defendant." *United States* v. *Dimas*, 3 F.3d 1015, 1020 (7th Cir. 1993); *United States* v. *Turk*, 870 F.2d 1304, 1306 (7th Cir. 1989).) Mutually antagonistic defenses alone are insufficient to warrant severance, however. *Zafiro*, 506 U.S. at 538; *see United States* v. *Plato*, 629 F.3d 646, 650 (7th Cir. 2010). A defendant must also show "prejudice to some specific trial right." *United States* v. *Mietus*, 237 F.3d 866, 873 (7th Cir. 2001); *accord Plato*, 629 F.3d at 651; *Dimas*, 3 F.3d at 1020; *see United States* v. *Rollins*, 301 F.3d 511, 518 (7th Cir. 2002) ("a defendant must demonstrate that the denial of severance caused him 'actual prejudice' that deprived him of his right to a fair trial") (citations omitted); *Vallone*, 698 F.3d at 486; *United States* v. *Souffrant*, 338 F.3d 809, 828 (7th Cir. 2003).[4]

### A.      Farella

Farella argues that severance was required because his entrapment defense was mutually antagonistic to that of Blais, and the presentation of both defenses compromised one of Farella's

---

[4] Farella supposes that mutually antagonistic defenses, where the acceptance of one defense *precludes* the acquittal of the other defendant, are distinct from "truly inconsistent" defenses, where the acceptance of one defense *significantly undermines* the jury's ability to accept the other. Acknowledging that he must show actual prejudice for mutually antagonistic defenses, he argues that where the defenses are both mutually antagonistic and truly inconsistent, he need not show actual prejudice. (*See* Dkt. #256, Farella Mem. at 10–11.) Apart from the lack of explanation of the substantive difference between the two terms and any mooring to a reason why a different standard should apply, the argument is not grounded in case law. His lifting of language from *United States* v. *Goodwin*, 496 F.3d 636 (7th Cir. 2007), stating that "acceptance of one defendant's defense precludes the acquittal of another defendant" is only prelude to the court's reiteration that the defendant had failed to demonstrate prejudice. *Id.* at 644 (citing *Zafiro*, 506 U.S. at 538, 113 S. Ct. at 937); *see also, e.g.*, *Mietus*, 237 F.3d at 873 ("Even a showing that two defendants have 'mutually antagonistic defenses,' that is, that the jury's acceptance of one defense precludes any possibility of acquittal for the other defendant, is not sufficient grounds to require a severance unless the defendant also shows prejudice to some specific trial right."). Thus, to succeed on his motion, Farella must show that the two defenses were mutually antagonistic and that the presentation of both defenses prejudiced one of Farella's specific trial rights.

specific trial rights and prevented the jury from making a reliable determination of his guilt or innocence.

### i.      Mutually Antagonistic Defenses

Farella first argues that severance was required because his entrapment defense and Blais's coercion defense were mutually antagonistic.  To submit a defense of entrapment to the jury, Farella had to demonstrate that (1) the government induced him to commit the offense; and (2) he was not otherwise predisposed to engage in the criminal conduct.  *United States* v. *Pillado*, 656 F.3d 754, 763 (7th Cir. 2011); *United States* v. *Santiago-Godinez*, 12 F.3d 722, 728 (7th Cir. 1993).  Once Farella established both elements, the burden shifted to the government to prove beyond a reasonable doubt either that Farella was not induced or that he was predisposed to commit the offense.  *See United States* v. *Lewis*, 641 F.3d 773, 781 (7th Cir. 2011); Tr. 2386–88.  The first prong of the defense was not contested at trial and the bulk of the evidence related to Farella's predisposition (or lack thereof) to commit the offense.

At trial, Blais presented what he characterized as a "lack of intent" defense, but which the court concluded also qualified as a coercion defense.[5]  To succeed on a coercion defense, Blais had to show that (1) he reasonably feared death or serious bodily harm unless he committed the offense; and (2) there was no reasonable opportunity for him to refuse to commit the offense and avoid the threatened injury.  *See Lewis*, 641 F.3d at 782; Tr. 2415–16.

As recounted in the Background section, Farella testified that he was not predisposed to commit the offense and that Steve, the government informant, induced him into it.  Under

---

[5] See part IV.B below re: Blais's argument that a coercion defense instruction was reversible error because his actual defense was a lack of intent to commit the crime.  Farella argues on the basis of a coercion defense and it is addressed as such.

Farella's theory, he was already entrapped by the time he met with Steve and Agent Bayless on January 16, 2009. From this point onward, testified Farella, his conduct towards Agent Bayless and Jamie was simply an "act" to appear tough and to convince Agent Bayless that he was the right person for the job. Farella argues that Blais's coercion defense was antagonistic to his own because Blais had to show that he reasonably feared death or serious bodily harm at the hands of Farella. As such, argues Farella, if the jury believed Blais's testimony that he reasonably feared Farella, then it could not accept Farella's testimony that he was not predisposed to commit the offense.

According to Farella, by the time he met Blais he was already entrapped, and he pretended to appear tough so as to convince Agent Bayless that he was capable of committing the offense. The evidence that he behaved like a thug in Blais's presence was consistent with Farella's determination to commit the crime because Steve led him to believe he could save his sister's life.[6] Although Farella testified that he only acted tough in front of Agent Bayless and Jamie and not his co-defendants, a reasonable juror could conclude that Farella maintained his tough guy act in front of Blais.[7] Indeed, Farella admitted that Blais witnessed at least part of this "act" when defendants met with Agent Bayless and Jamie at Portillo's to discuss the details of the robbery the night before their arrest. In short, if the jury had believed that Blais went ahead

---

[6] Moreover, Farella's testimony that he only acted tough in front of Agent Bayless and Jamie and not Blais speaks primarily to whether he was reluctant to engage in the criminal activity. Reluctance, or lack thereof, was only one of the factors the jury was instructed to consider when determining whether Farella was predisposed to commit the offense. (*See* Dkt. #217 at 32 of 55.)

[7] The jury was instructed "to decide whether the testimony of each of the witnesses is truthful and accurate, in whole, in part or not at all, as well as what weight, if any, you give to the testimony of each witness." (Tr. 2376.)

with the crime because he was afraid of Farella, as Blais testified, it could also have concluded that Farella was entrapped.

Farella relies on *United States* v. *Buljuasic*, 808 F.2d 1260 (7th Cir. 1987), in which the district court granted severance mid-trial after the co-defendant proffered that the defendant delivered money in payment for arson of the defendant's building because the defendant had threatened him "that a goon was waiting outside." *Id.* at 1264. Because the defendant denied having any knowledge of or involvement in the arson, the district court concluded that the acceptance of one defense precluded acceptance of the other and granted severance. This decision was not examined on appeal; thus, the appeals court had no occasion to consider the issue decided several years later in *Zafiro*. In any event, unlike the situation in *Buljuasic*, Farella did not contend that he was uninvolved such that Blais's testimony linked him to the crime. Nor was Blais the only one to testify to Farella's tough guy demeanor, including Farella himself.

Although Blais's testimony that he thought Farella was dangerous did not serve Farella's position that he lacked predisposition, "some tension" between defenses is tolerable. *United States* v. *Olson*, 450 F.3d 655, 677 (7th Cir. 2006); *see United States* v. *Hoover*, 246 F.3d 1054, 1061 (7th Cir. 2001) ("Finger-pointing among the defendants is not only acceptable but also a benefit of a joint trial, for it helps the jury to assess the role of each defendant."); *accord United States* v. *Hardiman*, Nos. 06-2951, 06-4087, 2007 WL 2445989, at *2 (7th Cir. Aug. 29, 2007). Thus, the fact that Blais's testimony painted Farella in an unflattering light is insufficient to demonstrate that the two defenses were mutually antagonistic as a matter of law. *Cf. United*

*States* v. *McClurge*, 311 F.3d 866, 871 (7th Cir. 2002) (no mutual antagonism where one defendant argued non-involvement and the other argued coercion).[8]

### ii.    Prejudice

Even if the two defenses were mutually antagonistic, Farella fails to show that the presentation of both defenses compromised one of his specific trial rights and prevented the jury from making a reliable determination of his guilt or innocence. Farella argues that his rights were prejudiced because (1) Blais's testimony resulted in the admission of improper character evidence; (2) Farella did not receive adequate notice that Blais intended to pursue a coercion-like defense; and (3) Blais's counsel acted as a *de facto* second prosecutor against Farella.

### 1.    Admission of Character Evidence

Farella argues that testimony concerning his character, although admissible as to Blais to show the effect on the listener, was inadmissible as to him because it supported the conclusion that he was of bad character and acted in accordance therewith in committing the offense. *See* Fed. R. Evid. 404(b). "[A]s a general proposition, . . . character evidence may be used to prove predisposition, if its probative value outweighs its potential for unfair prejudice." *United States* v. *Murzyn*, 631 F.2d 525, 528–29 (7th Cir. 1980) (collecting cases).

In *Zafiro*, the Court acknowledged that a joint trial could prejudice a specific trial right of a defendant when "[e]vidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice." 506 U.S. at 539 (citing *Bruton* v. *United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968)). But where

---

[8] Farella also argues that the core factual assertions made by him and Blais were inconsistent. Although Farella and Blais recalled certain facts differently, these factual inconsistencies are insufficient to prejudice one of Farella's specific trial rights.

Farella was able to cross-examine Blais and he also testified, he cannot rest on a *Bruton*-type argument.

Some of Blais's testimony (*e.g.*, that based on a "gut feeling" he thought Farella "was at a minimum an ex-con" and a "dangerous guy" (Tr. 2230–32)) would not have been admissible under Rule 404(a) had it been offered by the government. On the other hand, Farella's actions leading up to the planned robbery are highly relevant and, as previously discussed, the jury could have credited either or both defendants' testimony and still found that Farella was entrapped. Furthermore, Farella failed to object to most of the testimony that he now challenges. When he did object the court sustained his objections and instructed the jury that the evidence was to be considered only for its effect on the listener, not for its truth. (*See* Tr. 2247, 2268–69 (sustaining Farella's objections); *id.* at 2242 (instructing the jury that Blais's answer to the question "[w]hat, if anything . . . did Frankie Farella tell you about what . . . happened [between him and Agent Bayless] in the men's room" of Portillo's could "only be considered for the effect on the listener, not whether it is true or that it is true").) A jury is presumed capable of following the court's instructions, *see United States* v. *Lopez*, 6 F.3d 1281, 1286 (7th Cir. 1993), and at the close of trial, the court specifically instructed the jury to "give each of [the defendants] separate consideration" and "analyze what the evidence shows about each defendant, leaving out consideration of any evidence that was admitted solely against one of the defendants." (Dkt. #217 at 19 of 55.) The court therefore concludes that the admission of this evidence as to Blais was not unfairly prejudicial to Farella. *Cf. Zafiro*, 506 U.S. at 539 ("The risk of prejudice will vary with the facts in each case . . . [and] less drastic measures [than severance], such as limiting instructions, often will suffice to cure any risk of prejudice.").

## 2.     Inadequate Notice

Farella argues that Blais's late disclosure[9] of his defense violated Farella's Fifth and Sixth Amendment right to fair notice of charges against him.  These rights, however, flow from the government to a criminal defendant.  Farella cites no authority for his position that the Constitution requires a defendant to notify his co-defendant of his anticipated defenses.

Additionally, Farella argues that the late disclosure of Blais's defense violated his Sixth Amendment right to effective counsel because counsel was unable to thoroughly investigate Blais's past and veracity and was not fully prepared to cross-examine him.  *See* U.S. CONST. amend. VI.  To succeed on a claim of ineffective assistance of counsel, Farella "must demonstrate both that his counsel's conduct fell below an objective standard of reasonableness and that his counsel's sub-standard performance prejudiced him."  *United States* v. *Harris*, 394 F.3d 543, 554 (7th Cir. 2005) (citing *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).  The court has stressed that "[i]n assessing the adequacy of counsel's performance, the court's scrutiny must be highly deferential."  *Id.* at 555.  The few flaws identified in Farella's counsel's performance fail to satisfy this standard.  Moreover, even if Farella could show that his counsel's performance fell below an objective standard of reasonableness, the court remains unconvinced that but for counsel's alleged errors there is a reasonable probability that he would have been acquitted.

Blais's impressions of Farella were consistent with the tough guy persona that he was trying to project.  In addition, Farella's counsel effectively highlighted the weaknesses in Blais's

---

[9] Farella states that he did not learn until after the closing of his case-in-chief that Blais would present a coercion defense.  Prior to that time, Blais's counsel had indicated that he would present a defense of derivative entrapment.

testimony on cross-examination,[10] and Farella took the stand in rebuttal.  For these reasons, the court concludes that Blais's late disclosure of his defense did not prejudice Farella's specific trial rights under the Fifth and Sixth Amendments.

### 3.    *De facto* second prosecutor

Finally, Farella argues that he was unfairly prejudiced because Blais's counsel acted as a *de facto* second prosecutor against him and did not have a good-faith basis for questioning Farella about his need to pay for his sister's medication.  *See United States* v. *Sampol*, 636 F.2d 621, 658 (D.C. Cir. 1980) ("[C]ounsel must have a reasonable basis for asking questions on cross-examination which tend to incriminate or degrade the witness and thereby create an unfounded bias which subsequent testimony cannot fully dispel.") (cited in *United States* v. *Holt*, 817 F.2d 1264, 1274 (7th Cir. 1987)).  Blais's counsel cross-examined Farella two times.  The second time, the tone of the cross-examination was openly hostile.  This second cross-examination, however, was limited in duration and the court sustained most of Farella's counsel's objections.  As previously discussed, blame shifting among co-defendants is an accepted side effect of joint trials, and the fact that a defendant or his attorney "is a de facto prosecutor who will shift blame from himself to [co-defendants] . . . [does not typically] justif[y] severance."  *United States* v. *Andreas*, 23 F. Supp. 2d 835, 847 (N.D. Ill. 1998).  Any prejudice that resulted from Blais's counsel's limited cross-examination of Farella was insufficient to warrant severance.

### B.    Blais

---

[10]  For example, Blais admitted on cross-examination that he "could have made the decision . . . to walk away [from the robbery], but . . . hindsight is always 20/20" supporting the inference that Farella did not coerce him.  (Tr. 2336.)

For many of the same reasons already discussed, Blais argues that the court erred in refusing to sever his trial from that of Farella. Having already concluded that the two defenses were not mutually antagonistic and that the jury was free to credit none, all or part of each defendants' testimony, the court finds that it did not err in denying Blais's motion to sever.

### C.      Catanzaro

Catanzaro argues that Farella's entrapment defense was antagonistic to his own defense of non-involvement because, once the jury found Farella's defense unpersuasive, it was virtually impossible to acquit Catanzaro, the man whom Farella asserted was his accomplice. As noted by the government, "defenses of entrapment and non-involvement are not mutually antagonistic; the jury could consistently believe one, both, or neither of the defenses, and acceptance of one [does] not spell doom for the other defendant." *Dimas*, 3 F.3d at 1020. For these reasons, and those already discussed, the court concludes that Catanzaro has failed to show that severance was required. Defendants' motions for a judgment of acquittal or alternatively for a new trial based on the court's denial of their respective motions to sever are therefore denied.

## II.      Sufficiency of the Evidence

Defendants next argue that they are entitled to a judgment of acquittal or alternatively for a new trial because the evidence at trial was insufficient to sustain the verdict against them.

### A.      Farella

Farella challenges the sufficiency of the evidence arguing that the government failed to satisfy its burden of proof with regard to his entrapment defense. "Where a defendant offers a defense of entrapment, the government must prove either that it did not induce the defendant to commit the crime, or that the defendant had a predisposition to commit the crime." *United*

*States* v. *Villegas*, 655 F.3d 662, 674 (7th Cir. 2011). To satisfy its burden to prove

predisposition, the government presented audio and video recordings, witness testimony, phone

records, photographs, past crimes evidence, and other evidence demonstrating that Farella was

predisposed to commit the offense.[11] This evidence was more than sufficient to allow a

reasonable juror to conclude that Farella was not entrapped and the court will not disturb the

jury's verdict.[12]

**B.      Blais and Catanzaro**

Blais and Catanzaro argue that the evidence at trial was insufficient to support the jury's

verdict but offer little factual or legal authority in support of their positions. Even a brief review

of the government's evidence demonstrates that the evidence was sufficient to sustain the jury's

verdict against them; therefore, their respective motions are denied.

**III.     Evidentiary Rulings**

---

[11] The government, for example, presented (1) recordings of the first meeting between Farella and Agent Bayless where Farella discusses selling drugs and tells Agent Bayless, "I'm a fuckin' murderer" and "you can just ask anybody about me, brother;" (2) recordings where Farella discussed circumstances that necessitated killing the stash house guards; (3) evidence that it was Farella's idea to rob the stash house dressed as police officers, to secure phony license places and place sandbags in the getaway car to protect from bullets, and to conduct surveillance of the stash house in advance of the robbery; (4) evidence that Farella recruited Catanzaro to participate in the robbery; (5) testimony that Farella showed Agent Bayless a .45 caliber pistol in the Portillo's restroom; (6) text messages Farella sent to his girlfriend in the days leading up to the robbery stating that "I am doing this u cant change my mind so don't try," and "on mission at 3 pm;" and (7) evidence that Farella showed up to rob the stash house armed with a 9 millimeter pistol.

[12] Farella argues that the government was required to produce evidence that Farella was predisposed to commit the offense *before* Steve induced him. (Dkt. #256, Farella Mem. at 39–40; Dkt #272, Farella Reply at 10.) He also argues that the government was required to prove that he was predisposed to conspire to possess a specific quantity of cocaine. (*See* Dkt. #256, Farella Mem. at 40.) Farella cites no legal authority to support these positions and the court declines to consider them. *See United States* v. *Holm*, 326 F.3d 872, 877 (7th Cir. 2003) ("It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel." (internal quotation marks omitted)); *see also United States* v. *Andreas*, 150 F.3d 766, 769 (7th Cir. 1998) ("[P]erfunctory and undeveloped arguments (even constitutional ones) are waived[.]").

Defendants next argue that they are entitled to a new trial based on a number of the court's evidentiary rulings. To justify a new trial under Rule 33, an evidentiary ruling must be not only error but harmful error. *See United States* v. *Owens*, 424 F.3d 649, 653 (7th Cir. 2005). An error is harmful if it affects a defendant's "substantial rights." Fed. R. Crim. P. 52(a). "To affect substantial rights, in most cases the error must have been prejudicial, *i.e.* it must have affected the outcome of the case." *United States* v. *Patterson*, 23 F.3d 1239, 1255 (7th Cir. 1994) (internal quotation marks omitted); *see Owens*, 424 F.3d at 653 (error harmful if it "had a substantial influence over the jury, and the result reached was inconsistent with substantial justice" (internal quotation marks omitted)).

### A. Farella

Farella argues that the court erred in (1) admitting evidence from his proffer session; (2) admitting testimony regarding his legal research; and (3) precluding him from cross-examining Agent Bayless concerning his motive and bias.

### i. Admission of Evidence from Farella's Proffer Session

Farella first argues that the court erred by allowing the government to impeach him with statements he made during a proffer session with the United States Attorney's Office. Federal Rule of Evidence 410 provides that statements made by a defendant during plea discussions with a prosecuting attorney, where the discussions do not result in a guilty plea, are inadmissible against that defendant. Fed. R. Evid. 410(a)(4); *see also* Fed. R. Crim. P. 11(f). A defendant, however, "waives any objection to the use of his own proffer statements to impeach him at trial when he signs a proffer letter that specifically grants the government permission to impeach him if he testifies inconsistently, and later proceeds to testify inconsistently at trial." *United States* v.

*Dortch*, 5 F.3d 1056, 1068 (7th Cir. 1993); *see also United States* v. *Krilich*, 159 F.3d 1020, 1025 (7th Cir. 1999) (stating that the proffer "agreement allowed the prosecutor to use the proffer as evidence if [the defendant] were to testify contrary to the substance of the proffer or otherwise present a position inconsistent with the proffer" (internal quotation marks omitted)).

On February 6, 2009, Farella held a proffer interview with the government. During the interview, the government gave Farella a letter, which stated that the government would not use information from that proffer session in its case-in-chief during any subsequent prosecution but reserved the right to impeach Farella if he testified inconsistently at a subsequent trial. During Farella's direct examination, the government stated that it intended to impeach him on cross-examination with evidence from his proffer session. The government, however, could not locate Farella's signed proffer letter indicating that he had waived his rights under Rule 410.[13]

The court held an evidentiary hearing to determine whether Farella knowingly and voluntarily waived his rights by participating in the proffer session. (*See* Tr. 1410–35, 1457–1512.) At the hearing, the government presented evidence that it was the regular practice of the United States Attorney's Office not to proceed with a proffer interview without securing a signed proffer letter, although no one from the office could verify that Farella had, in fact, signed such a letter. After hearing the evidence, the court concluded that it was more likely than not that Farella signed the proffer letter thereby waiving his rights under Rule 410 should he testify inconsistently at trial. (*Id.* at 1510–12.) Farella presents no persuasive reason why the court's

---

[13] Farella admits that the proffer letter stated "if your client should subsequently testify contrary to the substance of the proffer, or otherwise present a position inconsistent with the profer [sic], nothing shall prevent the government from using the substance of the proffer at sentencing for any purpose, at trial for impeachment or in rebuttal testimony, or in a prosecution for perjury." (Dkt. #195 at 4; *see also* Tr. 1479.)

previous ruling should be disturbed.  Thus, for the reasons previously stated on the record, the court concludes that it did not err by allowing the government to impeach Farella with statements from his proffer session.

### ii.    Farella's Legal Research Regarding Predisposition

Farella next argues that the court erred by allowing the government to cross-examine him regarding legal research he conducted while awaiting trial.  According to the government, on January 11, 2011, Farella placed a phone call from jail to his mother and stated that, based on his legal research, he believed he was predisposed to commit the offense.  Over Farella's lawyer's objections, the government attempted to elicit this information from Farella on cross-examination, asking, for example, "Mr. Farella, you have studied entrapment cases since late December 2010, haven't you?" and "you yourself believe that your aggravated robbery conviction means that you were predisposed to commit the offense in this case[?]"  (Tr. 1755.) When required to answer, Farella answered "I don't believe [that I was predisposed]."  (*Id.* at 1758.)  Eventually, the government abandoned this line of questioning stating that it would return to the issue later but never did.  Farella then filed a motion for reconsideration and the court ruled that this line of questioning was improper and precluded the government from inquiring further.  (*See* Dkt. #202.)

Farella now argues that the introduction of this evidence entitles him to a new trial.  The evidence at issue, however, only amounted to a few questions during the government's extensive cross-examination.  Farella professed lack of memory in response to most of the government's questions and flatly denied that his legal research indicated that he was predisposed to commit the offense.  Any resulting prejudice was thus harmless and does not warrant disturbing the

jury's verdict.  *See United States* v. *Freitag*, 230 F.3d 1019, 1024 (7th Cir. 2000) (finding harmless error where "the challenged questions constituted only a small portion of the entire cross-examination and there was no significant impact on [the] defense").

### iii. Cross-Examination of Agent Bayless

Finally, Farella argues that he is entitled to a new trial because the court deprived him of his Sixth Amendment right to confront witnesses against him by precluding him from cross-examining Agent Bayless about certain statements that he made on the day of Farella's arrest. The Sixth Amendment's Confrontation Clause "protects the defendant's right to face those who testify against him and to conduct cross-examination," *United States* v. *Reese*, 666 F.3d 1007, 1020 (7th Cir. 2012), and includes a defendant's right to test a witness's bias.  *See United States* v. *Walker*, 673 F.3d 649, 657 (7th Cir. 2012).  The court, however, may impose reasonable limits on cross-examination "'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'"  *United States* v. *Vazquez*, 635 F.3d 889, 894–95 (7th Cir. 2011) (quoting *Delaware* v. *Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)).

In a recording made the day of Farella's arrest, Agent Bayless made a number of statements to other agents that Farella argues were indicative of his bias against Farella.  (*See* Dkt. #188.)  The court allowed Farella leeway to cross-examine Agent Bayless regarding some of these statements but precluded him from arguing that these statements evidenced his lack of predisposition to commit the offense.  (*See* Tr. 607-19.)  Farella now argues that the court's ruling did not go far enough because he was precluded from questioning Agent Bayless about a

handful of specific statements made on the day of his arrest.[14]  A review of the record, however, demonstrates that the court gave Farella ample opportunity to solicit Agent Bayless's motive and bias[15] and the Confrontation Clause does not require otherwise.  *See United States* v. *Clark*, 657 F.3d 578, 584 (7th Cir. 2011) ("[T]he Confrontation Clause does not a give a defendant a boundless right to impugn the credibility of a witness[.]"); *United States* v. *Linzy*, 604 F.3d 319, 324 (7th Cir. 2010) ("[T]he Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (internal quotation marks and emphasis omitted)).  The court did not err in limiting Farella's cross-examination of Agent Bayless in this manner and, even if one assumes that it did, the error was harmless.

### B.     Blais

Blais argues that he is entitled to a new trial because the court erred by precluding him from cross-examining Agent Bayless regarding the fact that the government declined to intercept and record phone calls between Farella, Catanzaro and Blais despite its ability to do so.  What the government did not do in its investigation has no relevance to the central question in this case, namely, whether Blais conspired with his co-defendants to possess and distribute cocaine.  Thus, the court concludes that it did not err in precluding Blais from soliciting such testimony.

---

[14]  Specifically, Farella argues that he was precluded from questioning Agent Bayless about the following statements: (1) that Agent Bayless "got over a few bumps in the road"; (2) that Jamie was "turning good deals for us"; (3) that "this [was] a total cold call"; and (4) that Agent Bayless "drew this guy [Farella] in" and "whipped a game on this guy."  (Dkt. #256, Farella Mem. at 45.)

[15]  For example, Agent Bayless admitted on cross-examination that he previously stated that he had "lit [Farella] up real good on the phone" and that he considered Farella to be "an aggravating piece of shit."  (Tr. 780–81, 789.)  Agent Bayless also admitted that he was concerned that defendants would come up with an excuse not to complete the crime.  (Tr. 786.)

*See United States* v. *Robbins*, 197 F.3d 829, 845 (7th Cir. 1999) (district court did not abuse its discretion in limiting cross-examination of agent's investigative steps because it could have "confuse[d] the jury and cause[d] it to speculate about what evidence is not before [it]").

## IV.    Jury Instructions

Next, defendants argue that they are entitled to a judgment of acquittal or alternatively to a new trial as a result of jury instruction errors.  "[T]he district court [has] substantial discretion to formulate the instructions so long as they represent a complete and correct statement of the law." *United States* v. *Noel*, 581 F.3d 490, 499 (7th Cir. 2009) (internal quotation marks and indicators omitted).  To receive a new trial based on erroneous jury instructions, "a defendant must show both that the instructions did not adequately state the law and that the error was prejudicial to [him] because the jury was likely to be confused or misled." *United States* v. *White*, 443 F.3d 582, 587 (7th Cir. 2006) (internal quotation marks omitted).  "When assessing whether prejudice has resulted, the Court must consider the instructions as a whole, along with all the evidence and arguments in the case, and then decide whether the jury was misinformed about the applicable law." *Warfield* v. *City of Chicago*, 679 F. Supp. 2d 876, 884 (7th Cir. 2010).

### A.    Farella

Farella argues that the court erred in failing to instruct the jury that the government must disprove entrapment as to a specific drug amount.  Instead, the court instructed the jury that the government must prove that Farella was not entrapped and allowed the jury to determine the

drug amount (if any) that Farella conspired to possess.[16]  Farella argues that these instructions
were improper because the government was required to prove that he was not entrapped as to the
specific drug quantity alleged in the indictment (5 kilograms or more of a substance containing
cocaine).  The court need not address this argument, however, because Farella failed to object to
the disputed instructions at trial and agreed to a revised version of the instructions for Counts I
and II and the verdict form.  *See* Tr. 2100–03, 2141–45, 2113–16, 2130–31, 2159, 2174; *see also*
*United States* v. *DiSantis*, 565 F.3d 354, 361 (7th Cir. 2009) (a defendant waives objection to a
jury instruction "if the record illustrates that the defendant approved of the instructions at issue"
(internal quotation marks omitted)); *United States* v. *Murry*, 395 F.3d 712, 717 (7th Cir. 2005)
(the defendant waived his objection to the jury instructions when "[t]he trial court asked [the
defendant's] counsel twice whether he had any objections to the instructions and twice he replied
definitively that he did not."); *Flis* v. *Kia Motors Corp.*, No. 03-CV-1567, 2006 WL 3590210, at
*6 (S.D. Ind. Dec. 8, 2006) (finding that the plaintiffs "did not object at trial to [the] Final Jury
Instruction . . . and thus have waived it as an objection post-trial").

  Moreover, considering that the robbery scheme always involved 50 kilograms of cocaine,
the court agrees with the government that the jury was unlikely to find that Farella *was*
predisposed to rob a stash house containing less than 5 kilograms of cocaine but *was not*
predisposed to rob a stash house containing 5 kilograms or more of cocaine, thereby compelling

---

[16]  *See* Tr. 2383 ("To sustain the charge of conspiracy to possess with the intent to distribute a
controlled substance against defendant Frank Farella, as charged in Count 1, the government must also
prove that defendant Farella was not entrapped."); *id.* at 2397 ("If you find defendant Frank Farella guilty
of the offense charged in Count 1, then you must find the type and amount of controlled . . . substances
involved in the offense charged in Count 1 that has been proved beyond a reasonable doubt.").

his acquittal.  For these reasons, Farella's motion for a judgment of acquittal or alternatively for a new trial is denied.

## B. Blais

Blais argues that he is entitled to a judgment or acquittal or alternatively for a new trial because the court (1) refused to instruct the jury on the requirements of entrapment; and (2) erroneously instructed the jury on the defense of coersion.

### i. Entrapment Instruction

Blais argues that the court erred in denying his request for an entrapment instruction. A defendant is entitled to a jury instruction regarding a defense if "(1) the requested instruction is a correct statement of the law; (2) the evidence supports the theory of the defense at issue; (3) the defense is not part of the government's charge; and (4) the failure to give the instruction would deprive the defendant of a fair trial."  *Hall*, 608 F.3d at 342–43.  Whether Blais was entitled to such an instruction largely turns on the second prong of the test, whether the evidence supported such a defense.

Before and during trial, Blais attempted to advance a theory of derivative entrapment.  In *United States* v. *Hollingsworth*, 27 F.3d 1196 (7th Cir. 1994), the Seventh Circuit stated that a defense of derivative entrapment arises "when a private individual, himself entrapped, acts as agent or conduit for governmental efforts at entrapment."  *Id.* at 1204.  In such a situation, "the government as principal is bound."  *Id.*  This defense is unavailable, however, when the private individual at issue is not entrapped or he works with his accomplices to expand, embroider, or elaborate the original scheme, and where the accomplice "independently of any embroidery by

the first entrapee [is] predisposed to join in the scheme." *Id*. at 1204–05 (internal quotation marks omitted).

The record demonstrates that the evidence did not support a theory of derivative entrapment as to Blais because (a) defendants expanded on the original robbery scheme; and (b) a reasonable juror could conclude that Blais was predisposed to commit the offense. Defendants expanded on the original robbery scheme by deciding to disguise themselves as police officers. Last, the evidence supports the conclusion that Blais was predisposed to participate in the conspiracy. Both his demeanor at the Portillo's meeting and his multiple suggestions on ways to further the scheme suggest that he was a willing participant in the offense. The court considered Blais's motion to present a defense of derivative entrapment multiple times before and during the trial. (*See, e.g.*, Dkt. #204, Tr. 2145, 2178–81, 2357–58.) Each time the court concluded that he had not presented sufficient evidence to support such a defense. Having listened to all the trial evidence, the court remains unpersuaded that its previous rulings were incorrect.

### ii. Coercion Instruction

Blais next argues that the court erred in giving the government's coercion instruction over his objection. The record reflects, however, that although there was colloquy about the form of the instruction, Blais's counsel never indicated that he objected to giving any coercion instruction. (Tr. 2343 *ff.*) Moreover, a jury instruction should be given when it "addresses an issue reasonably raised by the evidence." *United States* v. *Tanner*, 628 F.3d 890, 904 (7th Cir. 2010). An instruction on coercion is appropriate where the evidence shows that (1) the defendant reasonably feared death or serious bodily harm unless he committed the offense; and

(2) there was no reasonable opportunity to refuse to commit the offense and avoid the threatened injury. *Lewis*, 641 F.3d at 782; *see* Tr. 2415–16.[17]  Blais testified that he participated in the events leading up to his arrest because he feared retaliation from Farella if he did not.  This testimony falls within the rubric of coercion and instructing the jury as such was not incorrect. *See United States* v. *Sanders*, 962 F.2d 660, 676 (7th Cir. 1992) (coercion instruction appropriate where "a number of defendants argued that they did not enter this crime scheme willingly, but instead joined out of fear of what would happen . . . if they did not participate").[18]

## V.    Miscellaneous Objections

Finally, Blais argues that the court erred in various other ways; none of which warrants acquittal or a new trial.  Blais first argues that the court erred by allowing the government to amend Counts III and IV of the indictment to replace the plural use of "firearms" with the singular use of "firearm."  The court previously considered and rejected Blais's arguments on this issue and he fails to persuade the court that its reasoning was incorrect.  (*See* Dkt. #107.)

---

[17]  Blais argues that his testimony about fearing retaliation from Farella evidenced his lack of intent to conspire with his co-defendants to commit the offense and was not indicative of coercion.  In *United States* v. *Madoch*, 149 F.3d 596, 599 (7th Cir. 1998), the Seventh Circuit distinguished between a coercion defense and a defense based on lack of intent noting that in the former "the defendant essentially says that [he] understood what [he] was doing, but that [his] actions were compelled by a well-grounded, unavoidable, and immediate threat of death or serious bodily injury" while in the latter "the defendant argues that because of a diminished capacity [he] had no knowledge or intent to take the actions [he] did[.]"  (internal citations omitted).  Blais's testimony that he committed the offense based on his fear of Farella supports a coercion defense.

[18]  Blais also argues that the court erred by giving the jury an instruction based on *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946).  Blais's argument on this issue is perfunctory and undeveloped and the court declines to address it.  *See Andreas*, 150 F.3d at 769.

Blais also argues that the court erred in sustaining the government's objections and unduly restricting his closing argument. A review of the record demonstrates that Blais made several closing arguments that were inflammatory and/or irrelevant and that the government's objections were properly sustained.[19] *See Herring* v. *New York*, 422 U.S. 853, 862, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975) ("The presiding judge must be and is given great latitude in . . . limiting the scope of closing summations."); *United States* v. *White*, 472 F.3d 458, 462–63 (7th Cir. 2006) ("The trial judge has the discretion to limit argument over time-consuming peripheral issues in the interests of judicial economy and reducing juror confusion." (internal quotation marks omitted)). Blais's remaining arguments are undeveloped and unsupported by citation to legal authority and will not be considered in any detail here. *See Andreas*, 150 F.3d at 769. His motion for a judgment of acquittal or alternatively for a new trial is therefore denied.

## CONCLUSION AND ORDER

For the foregoing reasons, defendants' post-trial motions (dkt. #238, 239, 240) are denied. The case will be called for a status hearing to set sentencing dates set for September 11, 2013 at 9:00 a.m. for defendants Farella and Catanzaro and on September 18, 2013 at 9:00 a.m. for defendant Blais.

Dated: August 8, 2013                               Enter: _____
                                                    JOAN HUMPHREY LEFKOW
                                                    United States District Court

---

[19] For example, Blais's counsel stated, "I told you . . . that this case would be about sadistic manipulation;" he also commented on the government's investigation techniques stating, "I wish there were wiretaps on Frank Farella's phone." (Tr. 2595, 2600–01.)